# UNITED STATES DISTRICT COURT

for the

Eastern District of North Carolina

**FILED**

DEC 1 4 2020

PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC
BY _____ DEP CLK

| | |
|---|---|
| In the Matter of the Search of<br><br>*(Briefly describe the property to be searched or identify the person by name and address)*<br><br>**4205 MARTIN LUTHER KING STREET, AYDEN, NORTH CAROLINA** | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 4:20-MJ-1247

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ **Eastern** _____ District of _____ **North Carolina** _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), 843(b), 846; 18 U.S.C. § § 1956, 1956 | The use of a communications facility in the commission of controlled substances trafficking offenses, conspiracy to possess with intent to distribute and to distribute controlled substances, and money laundering offenses |

The application is based on these facts:

See attached affidavit of DEA Special Agent James Keczkemethy.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

James Keczkemethy, DEA Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ **telephone** _____ *(specify reliable electronic means)*.

Date: _____ **12/14/2020** _____

_____
*Judge's signature*

City and state: **Raleigh, North Carolina**

Hon. Brian S. Meyers, US Magistrate Judge
*Printed name and title*

SL

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: | Case No. _____ |
| 4205 Martin Luther King Street, Ayden, North Carolina | Filed Under Seal |

## AFFIDAVIT OF SPECIAL AGENT JAMES KECZKEMETHY

I, James Keczkemethy, a Special Agent with the Drug Enforcement Administration ("DEA"), being duly sworn, depose and state as follows:

## INTRODUCTION

1.      I am a Special Agent of the DEA and have been so employed since October 2017. As a DEA Special Agent, I am authorized to investigate violations of the laws of the United States, including violations of federal narcotics laws in Title 21 of the United States Code. I am also a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. Prior to my employment with DEA, I was a police officer in Hartford, Connecticut, for more than six years and was responsible for enforcing State of Connecticut motor vehicle and criminal laws, including narcotic violations.

2.      During my law enforcement career, I have participated in numerous investigations and arrests involving violations of state and federal controlled substances laws, including Title 21, United States Code, Sections 841(a)(1) and 846.  Many of those investigations resulted in arrests, indictments, and convictions for violations of drug laws and/or other criminal offenses, the seizure of drugs, money, and vehicles, and the forfeiture of personal property. My investigations have included the use of surveillance techniques, tracking warrants, and the execution of search, seizure,

and arrest warrants. I have participated in various aspects of narcotics investigations, including controlled and undercover purchases. Based on my training and experience, I am familiar with the appearance, packaging, and texture of many controlled substances, including fentanyl, cocaine base, and others.

3.     During my career in law enforcement, I have received training and gained experience related to a variety of criminal activities. In the course of my training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds and the organization of drug trafficking conspiracies. I have participated in all aspects of drug investigations, including Title III wiretaps, physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I have also reviewed recorded conversations and telephone, financial, and drug records. Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs. I have also become familiar with the manner in which narcotics organizations utilize various forms of violence and intimidation in furtherance of their narcotics trafficking activity, to protect their operations, members, narcotics, and narcotics proceeds.

4.     Based on my training and experience, I am aware that drug traffickers commonly use cellular telephones to communicate and further their drug-trafficking activities. However, drug traffickers are aware of law enforcement's use of electronic surveillance, and thus frequently endeavor to thwart detection by changing cellular telephone numbers, using multiple cellular phones at the same time, and/or utilizing prepaid cellular phones where the user of the phone is

not required to provide personal identifying information. I am also aware that drug traffickers frequently "drop" or change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance. I am familiar with the manner in which narcotics traffickers use coded, veiled, or slang-filled telephone conversations when discussing their illegal business, in an effort to further prevent detection, and that they often use text messages in lieu of telephone calls to avoid speaking over the telephone. I am familiar with the "street" language used by drug traffickers, as well as the methods they use to disguise conversation and operations.

5.     I have participated in the below-described investigation since July 2018. I make this affidavit based upon personal knowledge derived from my participation in this investigation and upon information (whether received directly or indirectly) that I believe to be reliable from numerous sources including, but not limited to, the following:

   a. My training and experience investigating drug-trafficking and money-laundering crimes;

   b. Oral reports, written reports, and documents that I have received from DEA and other federal, state, and local law enforcement agents;

   c. Physical and electronic surveillance conducted by me and other federal, state, and local law enforcement officers;

   d. Confidential sources of information;

   e. Public records;

   f. Business records;

   g. Telephone toll records, pen register and trap and trace information, and telephone subscriber information;

   h. Precise location information for cellular telephones;

   i. Controlled purchases of narcotics;

j. Evidence obtained from consensually-recorded wire and electronic communications;

k. Queries of law enforcement records and intelligence databases;

l. Execution of search warrants and tracking warrants;

m. Arrests of co-conspirators; and

n. Evidence obtained from judicially-authorized intercepted communications over Target Telephones (as described below).

## PURPOSE OF AFFIDAVIT

6.     I am submitting this affidavit in support of an application for the issuance of a search warrant authorizing the search of 4205 Martin Luther King Street, Ayden, North Carolina (hereinafter, the "Target Location"). The Target Location is a one-story single-family residence that has yellow siding with white trim. The residence is accessed through a white front door. The number "4205" is marked in black lettering that is affixed vertically to a slim white post that is attached to a small front porch. A complete description of the property to be searched is set forth in Attachment A, which is attached hereto and incorporated herein.

7.     As further discussed below, there is probable cause to believe that Jorge Luis Diaz, a/k/a Y.R.M. a/k/a "Gringuito", a/k/a "COSITA" ("COSITA")[1] is engaged in a conspiracy to distribute and possess with intent to distribute controlled substances; and (b) that COSITA used and is continuing to use the Target Location to operate his drug conspiracy.

8.     As a result, I submit that there is probable cause to believe that the Target Location (which is COSITA's residence) contains records and other evidence of the following offenses: (a) possession with intent to distribute and/or distribution of controlled substances, in violation of 21

---

1 Initials are used to represent the fraudulent identity used by COSITA to protect the true individual bearing this name, and who is not involved in the criminal conduct described in this affidavit.

U.S.C. § 841(a)(1); (b) use of a communications facility in the commission of controlled substances trafficking offenses, in violation of 21 U.S.C. § 843(b); (c) conspiracy to possess with intent to distribute and to distribute controlled substances, in violation of 21 U.S.C. § 846; and (d) money laundering offenses, in violation of 18 U.S.C. §§ 1956, 1957 (collectively, the "Target Offenses"). More specifically, as will be discussed below, I submit that there is probable cause to believe that within the Target Location there is evidence of the Target Offenses, as described in Attachment B.

9.    Because this affidavit is submitted for the limited purpose of establishing probable cause that evidence of criminal activity involving the Target Offenses is located at the Target Location, I have not included each and every fact known to me or other law enforcement officers involved in this investigation. Rather, I have included only those facts that I believe are sufficient to establish probable cause for the issuance of the requested search warrant. All times herein are approximate.

## SUMMARY OF INVESTIGATION

### A. Background of the Investigation

12.    Since May 2018, DEA investigators have been investigating a drug trafficking organization (hereinafter, the "FLACO DTO") that advertised the sale of narcotics by telephone. Based on the investigation discussed below, investigators learned that FNU LNU a/k/a FLACO ("FLACO") is a major drug supplier to the FLACO DTO. Further, as will be discussed below, the FLACO DTO is led by COSITA, who directs the actions of Lawrence, Massachusetts based DTO manager Anny CRUZ ("CRUZ"). The FLACO DTO has used various telephone numbers as its customer telephone number (hereinafter, the "Customer Telephone Number"), and has intermittently changed its Customer Telephone Number since the start of this investigation. The

Customer Telephone Number is used by customers of the FLACO DTO to place orders for a variety drugs, including cocaine, cocaine base, and fentanyl. Based on the investigation and as discussed below, I believe that COSITA is the operator and user of the FLACO DTO Customer Telephone Number.

13.     During the investigation, the FLACO DTO has changed the Customer Telephone Number numerous times.  Based on the investigation, whenever the FLACO DTO changed its Customer Telephone Number, the FLACO DTO sent a text message from the new Customer Telephone Number to drug customers informing them of the new telephone number for placing drug orders and advertising the sale of illicit drugs.  For example, on March 10, 2020, at 4:20 p.m., a confidential informant ("CS-1") received a text message from telephone number (978) 376-8310, believed to be a new Customer Telephone Number, which stated:  "Iam goku new Number got ultimate best quality guaranteed around brown, white, hard white, e pill, and [sic].  Delivery everywhere."  Based on the investigation, I believe that this introductory text message from the FLACO DTO advertised the sale of heroin and/or fentanyl, cocaine, crack cocaine, and ecstasy pills ("brown, white, hard white, e pill," respectively). During the investigation, similar text messages have been received by an undercover telephone used by a DEA investigator conducting controlled purchases from the FLACO DTO.  During the investigation, the FLACO DTO has used at least four different monikers to advertise the sale of narcotics, including "Flaco," "Peter," "Goku," and "Vegueta." Based upon the diction in the telephone conversations, and manner and means of operation, I believe that all of these monikers are used by the FLACO DTO.  Based upon my training and experience, I know that drug traffickers are often aware of law enforcement's use of electronic surveillance, and thus frequently change telephone numbers and nicknames in an effort to thwart law enforcement's use of electronic surveillance.  Based on the investigation, I

believe that COSITA controls the Customer Telephone Number and is engaging in this pattern of behavior by frequently changing telephone numbers, including the Customer Telephone Number.

14.     Since May 2018, investigators have conducted numerous controlled purchases of narcotics from the FLACO DTO. Two of those controlled purchases are detailed below. During each controlled purchase, DEA investigators used an undercover police officer (the "UC") to conduct controlled purchases of fentanyl from the FLACO DTO by contacting the Customer Telephone Number. After negotiating the quantity of fentanyl and purchase price, FLACO directed the UC to various locations in Lawrence, Lowell, Methuen, and Haverhill (the "Merrimack Valley region") in Massachusetts and arranged for a drug courier to meet the UC to complete the drug transaction. After conducting controlled purchases from May 3, 2018 to February 11, 2019, a number of drug couriers and stash house operators working for the FLACO DTO were arrested and indicted, and some have been sentenced, all in the District of Massachusetts. *See United States v. Jose Hernandez*, *et al.,* 18-CR-10348-LTS; *United States v. Antonio Camillo*, 19-CR-10024-DJC; and *United States v. Jesus Rojas*, 19-CR-10112-LTS. Drug analysis reports from the controlled purchases confirmed the presence of fentanyl and/or cocaine base, depending on which substance was ordered.

**B.  Title III Electronic Surveillance**

15.     On July 6, 2020, the Honorable Patti B. Saris, United States District Court Judge, District of Massachusetts, signed an Order authorizing the initial interception of wire and electronic communications to and from (917) 325-2975 ("Target Telephone 1"), used by CRUZ.

16.     On August 19, 2020, the Honorable Denise J. Casper, United States District Court Judge, District of Massachusetts, signed an Order authorizing the initial interception of wire and electronic communications to and from (1) (646) 348-4879 ("Target Telephone 2"), used by

CRUZ; (2) (917) 209-9230 ("Target Telephone 3"), used by FLACO; and (3) (781) 513-1118 ("Target Telephone 4"), used by a drug supplier known as CIBAO.

17.    On September 18, 2020, the Honorable Patti B. Saris signed an Order authorizing the initial and/or continued interception of wire and/or electronic communications to and from (1) Target Telephone 3; (2) (646) 249-3303 ("Target Telephone 5"), used by CRUZ; and (3) (978) 242-3410 ("Target Telephone 6"), used by FLACO DTO manager DEMONIO.

18.    On November 4, 2020, the Honorable Patti B. Saris signed an Order authorizing the initial and/or continued interception of wire and/or electronic communications to and from (1) Target Telephone 3; (2) (978) 566-4660 ("Target Telephone 7"), used by a drug supplier known as MANGUERA; and (3) (617) 407-7964 ("Target Telephone 8"), used by CRUZ.

19.    On December 1, 2020, the Honorable Patti B. Saris signed an Order authorizing the initial and/or continued interception of wire and/or electronic communications to and from (1) Target Telephone 3; (2) Target Telephone 7; and (3) (617) 515-9539 ("Target Telephone 9"), used by CRUZ.

20.    Throughout the course of this investigation, the Honorable Marianne B. Bowler, United States Magistrate Judge, District of Massachusetts, has signed numerous warrants authorizing the government to obtain precise location information about the Target Telephones and other phones used by COSITA and his co-conspirators, to use a cell-site simulator device, and to install GPS devices on vehicles used by COSITA's co-conspirators.

## PROBABLE CAUSE

### A.  Part I: Controlled purchases of suspected fentanyl

November 16, 2020: Controlled purchase of 10 grams of suspected fentanyl from Courier-2

21.     On November 14, 2020, an undercover officer who had made prior controlled purchases from the FLACO DTO received a text message from telephone number (603) 289-4557. As discussed above, the pattern of the FLACO DTO is to send a text message to drug customers advertising the sale of narcotics when changing to a new Customer Telephone Number. The text message stated, "Iam vegueta this is my New number I got the amazing stuff I called blue magic, I do delivery everywhere, Down, white, e pill.. stop buying garbage you deserve good quality and safe product." I am familiar with "Vegeta" as a character from the animated series Dragon Ball Z. In the past, the FLACO DTO has advertised the sale of drugs using the moniker "Goku," another character from Dragon Ball Z. Based on the contents of the text and my knowledge of the investigation, I believe that the FLACO DTO had the UC's telephone number from prior controlled purchases and sent the UC a text message advertising the sale of drugs ("Down (meaning, heroin and/or fentanyl), white (meaning, cocaine), e pill (meaning MDMA a/k/a Ecstasy)") using the new moniker "Vegueta."

22.     On November 16, 2020, at 11:46 a.m., the UC sent a text message to the Customer Telephone Number (603) 289-4557 and stated, "Can i see u." The user of the Customer Telephone Number responded, "What do you want?" The UC stated, "Fingr," meaning a finger of fentanyl. A "finger" is a common street term for 10 grams of fentanyl. The user of the Customer Telephone Number then sent a text message to the UC and stated, "K come. 35 computer dr Haverhill ma." I believe the user of the Customer Telephone Number directed the UC to 35 Computer Drive in Haverhill, Massachusetts to complete the deal for 10 grams of fentanyl. Based on the investigation, investigators knew that the FLACO DTO charged $200 for 10 grams of fentanyl. At 12:11 p.m., the UC received another text message from the Customer Telephone Number stating, "Summit

ave Lawrence ma." I believe that the user of the Customer Telephone Number changed the meeting location to Summit Avenue in Lawrence, Massachusetts.

23.     Prior to travelling to Summit Avenue, the UC was equipped with an audio-recording and surveillance device and $200 of official agency funds. At 12:39 p.m., the UC arrived and parked on Summit Avenue in Lawrence. The UC then sent a text message to the Customer Telephone Number stating, "Here." At 12:44 p.m., investigators observed Courier-2 leave his residence a short walk from Summit Avenue and directly approach the UC's vehicle. Investigators were familiar with Courier-2 from a prior controlled purchase of fentanyl on October 28, 2020 using a prior Customer Telephone Number. Courier-2 opened the front passenger door of the UC's vehicle and provided one blue, opaque bag containing a compressed, powdery substance to the UC. The UC provided the $200 of official agency funds to Courier-2. Based on my training and experience and the investigation, I believe that Courier-2 provided the UC with 10 grams of fentanyl. Courier-2 then approached a white vehicle bearing New Hampshire plates and leaned into the passenger window for a brief interaction. The UC then departed the area and provided the suspected fentanyl to investigators. The suspected fentanyl was transported to the DEA Northeast Regional Laboratory for confirmatory analysis, which remains pending. The suspected fentanyl was not field tested due to officer safety concerns. All the communications between the UC and the Customer Telephone Number are preserved.

24.     Suspecting that Courier-2 had also provided fentanyl to the occupants of the white New Hampshire vehicle, investigators followed the vehicle to Salem, New Hampshire. In Salem, a marked Salem Police officer stopped the vehicle at a rest stop on Route 93 northbound. An investigator approached the vehicle and observed in plain view hypodermic needles, cotton swabs, (all tools for ingesting fentanyl) and a blue plastic bag containing approximately 5 grams of

suspected fentanyl. Investigators provided *Miranda* warnings to the driver of the vehicle. The driver then stated she understood the *Miranda* warnings and told investigators she had just purchased 5 grams of fentanyl from a Hispanic male in the area of Summit Avenue and High Street in Lawrence. The suspected fentanyl was seized and was transported to the New Hampshire Drug Laboratory for analysis, which remains pending. The suspected fentanyl was not field tested due to officer safety concerns. The driver was arrested and charged in state court with drug possession. Prior to her arrest, the driver showed the investigators a text message from telephone number (603) 952-0304 on September 19, 2020 that stated, "IAm vegueta this is my new number I have new material as strong as you can imagine I don't think you have ever tried something so original so pure down. Hard white, white soft, e pill. My product is going to called. Blue magic very powerful down. We have deliver." I believe that the driver of the New Hampshire vehicle had also received an advertisement from the FLACO DTO from a different Customer Telephone Number advertising the sale of drugs ("Down (meaning, heroin and/or fentanyl). Hard white (meaning, cocaine base), white soft (meaning, cocaine), e pill (meaning, MDMDA, a/k/a Ecstasy)."). Based on the investigation, I believe that the FLACO DTO operates multiple Customer Telephone Numbers.

<u>December 8, 2020: Controlled purchase of 20 grams of suspected fentanyl from Courier-1</u>

25. On December 8, 2020, at 11:14 a.m., the UC sent a text message to the Customer Telephone Number (603) 289-4557 and stated, "Can i see u." The user of the Customer Telephone Numbers wrote, "What do you want?" The UC responded, "2 fingr," meaning two fingers of fentanyl or 20 grams of fentanyl. The user of the Customer Telephone Number then sent a text message stating, "Oakwood ave Lawrence ma." The UC understood this to mean that the deal would be completed in the area of Oakwood Avenue in Lawrence.

26.     Prior to travelling to Oakwood Avenue, the UC was equipped with an audio-recording and surveillance device and $400 of official agency funds. At 12:02 p.m., the UC arrived and parked on Oakwood Avenue in Lawrence. The UC then sent a text message to the Customer Telephone Number stating, "Here." Minutes later, the UC observed Courier-1's Acura TL (hereinafter, the "Acura TL") travelling on Oakwood Avenue from Ferry Street.[2] The Acura TL travelled down Oakwood Avenue to Ridge Road, turned around on Ridge Road, proceeded back onto Oakwood Avenue, and stopped alongside the UC's vehicle so that both vehicles' passenger windows were facing each other. The UC rolled down the passenger seat window as the Acura TL's passenger window also rolled down. The UC observed Courier-1 as the driver and sole occupant of the Acura TL. The UC exited the UC vehicle and walked to the passenger side of the Acura TL. The UC leaned into the open passenger seat window and observed Courier-1 holding one clear plastic bag containing two compressed objects tied in yellow wax paper. The UC exchanged the $400 of recorded agency funds for the plastic bag. Based on my training and experience and the investigation, I believe that Courier-1 provided the UC with 20 gram of fentanyl in the two bundles of wax paper. The UC and Courier-1 parted ways and the UC provided the suspected fentanyl to other investigators. Due to officer safety concerns, the suspected fentanyl was not field tested. The suspected fentanyl will be sent to the DEA Northeast Regional Laboratory for analysis, which remains pending. All the communications between the UC and the Customer Telephone Number are preserved.

**B.   Part II: COSITA identified as user of Customer Telephone Number**

COSITA identified through voice comparison

---

2 Courier-1 drove the Acura TL to a prior controlled purchase of fentanyl on October 19, 2020 and the UC had previously identified Courier-1 after viewing his photograph from the Massachusetts Registry of Motor Vehicles database.

27.     On November 18, 2020, the UC exchanged text messages and phone calls with the user of the Customer Telephone Number (603) 289-4557. These communications are preserved. During a phone call, an unidentified male conversed in English, but had a side conversation in Spanish overheard on the call. On November 25, 2020, a Spanish speaking agent familiar with this investigation reviewed the Spanish portion overheard on the call with the UC and compared it with a call between CRUZ, using Target Telephone 5, and COSITA, who was using (603) 952-0317. COSITA was identified as the user of (603) 952-0317 because CRUZ identified him by that name during intercepted calls and based on surveillance of CRUZ and COSITA together on September 23, 2020 in Andover, Massachusetts. This call was intercepted over Target Telephone 5. The Spanish speaking agent conducting the voice comparison believes that COSITA was the user of the Customer Telephone Number on November 18, 2020 during the call with the UC.

<u>COSITA identified through precise location warrants</u>

28.     During the period between October 6, 2020 and October 9, 2020, investigators obtained the precise location information of COSITA's telephone (603) 952-0317. During this time period, COSITA's telephone was frequently located in the area of Fifth Street and High Street, Ayden, North Carolina. The Target Location is within several hundred meters from where COSITA's telephone was frequently located. On October 15, 2020, a DEA agent conducted surveillance of the Target Location. The agent photographed Lopez and COSITA (identified through social media photographs depicting COSITA and Lopez) around the front porch of the property. COSITA was carrying a new rolled-up carpet into the Target Location. The agent also observed a Honda Accord, bearing North Carolina registration HLR7250, at the residence. A photograph of the vehicle is included in Attachment A. The vehicle is registered to Lopez at the

Target Location. Credit reports from July 2020 for Tatiana Lopez also list her at the Target Location.

29.     A Clear inquiry also identified that in February 2020, Lopez was in a motor vehicle accident in Andover, Massachusetts.[3] During the accident, Lopez's child was in the vehicle. The child was born in 2019, which is consistent with the age of Lopez and COSITA's child. The birth certificate of the child lists the father as Jorge Luis Diaz, born in Bani, Dominican Republic. I have reviewed Jorge Luis Diaz's photo identification from the Dominican Republic and I believe that Jorge Luis Diaz is COSITA's true identity.

30.     On November 25, 2020, investigators obtained a warrant to identify the precise location of the Customer Telephone Number (603) 289-4557. From November 27, 2020 to December 7, 2020, the precise location information for telephone number (603) 289-4557 was located within feet of the Target Location. I believe that COSITA is the user of the Customer Telephone Number, and he receives orders from drug customers and dispatches drug couriers to fulfill those orders from his residence at the Target Location.

**Drug Traffickers' Use of Residences, Vehicles, and Cell Phones Generally**

31.     Based on my training and experience, and the collective experience of other investigators participating in this investigation, I know that traffickers of controlled substances frequently maintain, at their residences or stash locations, quantities of illicit drugs to maintain their ongoing drug business. I also know that traffickers of controlled substances usually keep, in addition to drugs, paraphernalia for the packaging, diluting, cutting, weighing, processing, and distributing of controlled substances, including scales, plastic bags, cutting agents, and utensils, at

3 Clear is an investigative platform that searches propriety sources and public records to obtain information on individuals and businesses

their residences or stash locations. Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to store drug-related paraphernalia in their residences or stash locations for longer periods of time than they keep drugs there.

32.     Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences of drug-traffickers, it is generally a common practice for drug traffickers to maintain in their residences records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, record-keeping is necessary to keep track of amounts paid and owed, and such records are often kept close at hand so that current balances can be verified and recorded.  Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers. Additionally, drug traffickers often maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

33.     Even when drug dealers store their drugs outside their residence, I know that they often will keep records relating to these offsite storage locations at their primary residence.  Such documents include rental or storage property agreements and receipts.

34.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that it is generally a common

practice for traffickers to conceal at their residences either the proceeds from drug sales or monies to be used to purchase controlled substances. Drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances, and evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking are often kept in their residences. Moreover, the cash proceeds of drug trafficking often contain traces of the narcotics sold or bought by the drug dealers.

35.     Moreover, drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities, and many of these cellular telephones are kept at their residences. It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses. Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them. Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones. As a result, I am aware that collections of cell phones have been found during drug trafficking search warrants that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

36.     When drug traffickers amass proceeds from the sale of drugs, they often attempt to launder/legitimize these profits, or otherwise conceal them from discovery by law enforcement. In an effort to accomplish these goals, drug traffickers often place assets, such as vehicles and residences, in the names of other persons to conceal their true ownership and the manner in which they were acquired. Records reflecting the implementation of such deceptive practices, such as deeds, titles, and service records, are likely to be found inside the residence of the drug trafficker.

37.     Finally, as noted above, evidence of drug crimes can be found in the cell phones and smart phones referenced in the preceding paragraphs. Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails, text messages or instant messages.  From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B on their cellular telephones.

38.     It should be noted that, with the advance of technology, the distinction between computers and cellular telephones is quickly becoming less clear. Actions such as internet searching or emailing, in addition to calling and text messaging, can now be performed from many cell phones.  In addition, those involved in drug trafficking crimes commonly communicate using multiple cellular telephones. Contemporaneous possession of multiple cellular telephones can often be evidence of drug trafficking. Moreover, the particular numbers of and the particular numbers dialed by particular cellular telephones can be evidence of drug trafficking, particularly in a case involving the interception of communications between drug traffickers. Such numbers can confirm identities of particular speakers and the occurrence of certain events.

39.     As with most electronic/digital technology items, communications made from an electronic device, such as a computer or a cell phone, are often saved or stored on the device. Storing this information can be intentional, for example, by saving an e-mail as a file on a computer or saving the location of one's favorite websites in "bookmarked" files. Digital information can also be retained unintentionally. Traces of the path of an electronic communication or of an internet search may be automatically stored in many places on a computer or a cell phone. In addition to electronic communications, a user's Internet activities generally leave traces in the web cache and

Internet history files. A forensic examiner often can recover evidence that shows when and in what manner a user of an electronic device, such as a computer or a cell phone, used such a device.

40.     Electronic files or remnants of such files can be recovered months or even years after they have been downloaded, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they often can be recovered months or years later using readily available forensic tools. When a person "deletes" a file on an electronic storage device such as a computer, the data contained in the file often does not actually disappear; rather, that data often remains on the device until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space -- that is, in space on a device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space -- for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from an electronic storage device depends less on when the file was sent, downloaded, or viewed than on a particular user's operating system, storage capacity, and habits.

41.     I have participated in the execution of numerous search warrants at the residences of drug traffickers similar to the Target Location. In a substantial number of residential searches executed in connection with the drug investigations in which I have been involved, the following

types of drug-related evidence typically have been recovered in both conventional and electronic formats:

    a.   controlled substances;

    b.   paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, microwave ovens, heat-sealing devices, and diluents such as mannitol, mannite, and inositol;

    c.   books, records, receipts, notes, ledgers, letters, and other papers relating to the distribution of controlled substances, travel for the purpose of acquiring and/or distributing controlled substances, and to monetary transactions involving the proceeds from the sale of controlled substances;

    d.   personal books, papers, and other electronic devices reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances, money laundering, and the criminal use of communication facilities;

    e.   cash, currency, and records relating to the generation of income from the sale of controlled substances and the expenditure of such income, including money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, as well as consumer items such as electronic equipment, vehicles, jewelry, and precious metals such as gold and silver, and precious gems such as diamonds - it should be noted that possession of the valuable items referenced in this paragraph, particularly by individuals

with no substantial legitimate source of income, is evidence of drug trafficking as opposed to drug use;

f.  documents and other records indicating travel in interstate and foreign commerce, such as maps, GPS coordinates, navigation coordinates, travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills and related communications;

g.  cellular telephones, smart phones, electronic tablet devices, and other electronic media utilized for communication, transportation, and data acquisition and retention purposes related to acquiring and distributing illegal drugs and proceeds, including incoming and outgoing call and text message logs, contact lists, photo and video galleries, sent and received text messages, online searches and sites viewed via the internet, online or electronic communications sent and received (including email, chat, and instant messages), sent and received audio files, navigation, mapping, and GPS files, telephone settings (including contact lists) text messages, and related identifying information such as telephone identification numbers, call forwarding information, messages drafted but not sent, and voice messages;

h.  firearms and other dangerous weapons; and

i.  identification evidence and/or indicia, such as cell phones with particular numbers, mail, deeds, leases, rental agreements, photographs, bills, and identification documents, that tend to identify the person(s) in residence, occupancy, control, or ownership of subject premises and/or subject communication devices.

42.     Based on all of the information I have obtained during the course of this investigation, and for the reasons more specifically set forth herein, I believe that COSITA has engaged in and will continue to engage in the Target Offenses.  I believe that evidence of COSITA's drug trafficking offenses will be found inside the Target Location and on certain cellular telephones seized therefrom.

## **CONCLUSION**

43.     Based on the information set forth above, I believe probable cause exists to conclude that COSITA has conspired and continues to conspire to possess with intent to distribute fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and that evidence of the Target Offenses, as set forth in Attachment B will be found inside the Target Location set forth in Attachment A.

44.     Because the warrant, accompanying affidavit, and application in support thereof reveal an ongoing investigation, it is further requested that the warrant, accompanying affidavit, and application be sealed until further order of the Court in order to avoid premature disclosure of the investigation, guard against the flight of fugitives, and better ensure the safety of agents and others, except that copies of the warrant in full or redacted form may be maintained by the United States Attorney's Office, and may be served on Special Agents, Task Force Officers, and other investigative and law enforcement officers of the DEA, federally deputized state and local law enforcement officers, and other government and contract personnel acting under the supervision of such investigative law enforcement officers, as necessary to effectuate the warrants.

45.     I, James Keczkemethy, having signed this Affidavit under oath as to all assertions and allegations contained herein, state that its contents are true and correct to the best of my knowledge, information, and belief.

Respectfully submitted,

James Keczkemethy
Special Agent
Drug Enforcement Administration

Pursuant to Rule 4.1 of the Federal Rules of Criminal Procedure, the affiant appeared before me via reliable electronic means, was placed under oath, and attested to the contents of this written affidavit.

Dated:   December 14, 2020; 4:49 pm

Brian S. Meyers
United States Magistrate Judge

22

**ATTACHMENT A**

**(Location to be searched)**

4205 Martin Luther King Street, Ayden, North Carolina (the "Target Location") is a one-story single-family residence that has yellow siding with white trim. The residence is accessed through a white front door. The number "4205" is marked in black lettering that is affixed vertically to a slim white post that is attached to a small front porch. A photograph of the Target Location is attached.



**ATTACHMENT B**

**(Items to be seized)**

All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution and possession with intent to distribute controlled substances), 843(b) (use of a communication facility during or in relation to a controlled substances trafficking offense), and 846 (conspiracy to distribute and possess with intent to distribute controlled substances); and/or 18 U.S.C. §§ 1956, 1957 (money laundering offenses) (collectively, the "Target Offenses"):

1. Any books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances. Such documents include, but are not limited to, ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; airline travel records; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

2. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers. Such documents include, but are not limited to, telephone address books; planners; notes; ledgers; and telephone bills.

3. Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

4. Any documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage units.

5. Any items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the Target Location. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

6.      Photographs or videos concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

7.      Cellular telephones, computers, and other electronic storage media, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking or money laundering and/or referencing individuals engaged in drug trafficking or money laundering, located in the memory of any electronic storage media, including but not limited to:

a.      Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking or money laundering;

b.      Any logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

c.      Any text messages both sent to and received from the device(s) (including any in draft form) relating to or referencing drug trafficking or money laundering and/or referencing individuals engaged in drug trafficking or money laundering;

d.      Any information involving the travel to obtain controlled substances or the transportation of controlled substances

e.      Any incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

f.      Any GPS data;

g.      Any browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

h.      Any documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

i.      All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

j.      Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

During the search of the Target Location described in these warrants, law enforcement personnel are authorized to press the fingers (including thumbs) of Jorge Luis Diaz, a/k/a COSITA to the fingerprint sensor of the device found at the Target Location and/or use the camera of the cellular telephone to scan the face of COSITA for the purpose of attempting to unlock the device in order to search the contents as authorized by these warrants.  **This authorization with respect to use of the fingerprint sensor and camera is limited to the device associated with telephone number (603) 289-4557 and (603) 952-0317, used by COSITA. Investigators may dial both telephone numbers to determine if the telephones are in the Target Location or on the person of COSITA.**